# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01019-COA

**KELVIN GREEN**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/2021 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN T. COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY B. FARMER |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| DISPOSITION: | AFFIRMED - 11/15/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. Following a jury trial in the Circuit Court of the First Judicial District of Harrison County, Mississippi, Kelvin Green was found guilty of sexual battery and was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Green's post-trial motion for judgment notwithstanding the verdict or for a new trial was denied by the circuit court, and Green appealed his conviction and sentence.

## FACTS

¶2. Green's indictment alleged that between February 1, 2018, and February 22, 2018, he

committed sexual battery upon Jane,[1] who was under fourteen years of age. The indictment further alleged that Green engaged in an act of sexual penetration by having sexual intercourse with Jane. Proof at trial showed that Green was fifty-eight years old at the time of the alleged offense, and Jane was eight years old. Jane testified that she lived on 17th Street in Gulfport with her mother and father until her mother's death in 2017. After her mother's death, she continued to live in the house with her father, who is legally blind, and there were always people in and out of the house to help them. Green was one of the people who would come to help out, and according to Jane, he was staying at the house at the time of the alleged sexual battery. Jane described that on one occasion in the living room of the house, while her father was asleep, Green pulled off her clothes and had sexual intercourse with her. She said she did not tell anyone because she was scared.[2] She first disclosed the sexual assault to her social worker, and as a result, the Department of Human Services arranged for Jane to have a forensic interview with Sarah Flagg at the Child Advocacy Center (CAC) on February 27, 2018. This interview was recorded, admitted into evidence, and played for the jury at trial. During this interview, Jane disclosed, among other things, that Green had sexual intercourse with her at her house.

¶3.    The State called a total of seven witnesses at trial. The defense called two witnesses,

---

[1] The victim's name has been changed to protect her identity.

[2] About three weeks prior to this event, Jane had reported to her school counselor that Green had tried to drown her and had punched her in the face.

including Green, who denied that he had sexual intercourse with Jane.[3] After considering all the evidence and applying the law as instructed by the trial court, the jury returned a verdict finding Green guilty of sexual battery.

## DISCUSSION

¶4.     Green raises the following issues on appeal.

### I.     Was the evidence legally sufficient to support Green's conviction?

¶5.     Green contends that no evidence submitted by the State supports his conviction of sexual battery. As a result, he asks this Court to reverse the jury's decision and render a verdict of not guilty. Our standard of review on a challenge to the legal sufficiency of the evidence was stated in *McLaughlin v. State*, 338 So. 3d 705, 717 (¶33) (Miss. Ct. App. 2022), as follows:

> Rulings on the sufficiency of the evidence claims are reviewed de novo. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). When a challenge to the sufficiency of the evidence is being reviewed, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). The evidence is viewed in a light most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence. *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). If the court finds that "any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)).

¶6.     Green contends that his conviction rests solely upon Jane's testimony and statements

---

[3] More detail concerning the testimony and procedural history will be addressed in our discussion of Green's assignments of error.

made by her during her interview at the CAC. He acknowledges that Jane's uncorroborated testimony could be sufficient to support his conviction if it is not discredited or contradicted by other credible evidence. However, Green argues that because Jane's testimony was "self-contradictory and riddled with misrepresentations," it is insufficient to support his conviction.

¶7.     In *Ladnier v. State*, 878 So. 2d 926, 931 (¶15) (Miss. 2004), a thirteen-year-old testified that her grandmother's boyfriend rubbed her breast while they were riding a three-wheeler. The defendant challenged the sufficiency of the evidence that he touched the child for the purpose of "indulging his depraved licentious sexual desire and that there was no testimony which corroborated that the touching was anything more than accidental." *Id.* at 929 (¶10). However, the supreme court noted that the child testified that the defendant rubbed her breast the entire time they were riding the three-wheeler. *Id.* at 930 (¶13). The supreme court recognized that there were inconsistencies between the child's testimony and that of other witnesses but stated:

> Although there were inconsistencies between Anne's testimony and that of other witnesses, issues of witness credibility and the weight to be accorded a witness's testimony are matters to be resolved by the trier of fact, in this case, the jury:
>
>> Our case law is axiomatic on the proposition that the jury is arbiter of the credibility of testimony. "It is, of course, within the province of the jury to determine the credibility of witnesses . . . ." "The conflict between the testimony of the appellant and the prosecutrix was properly resolved by the jury." "**We are asked to reverse this case on the grounds that there are inconsistencies and contradictions in her testimony. If this be true, it would still be a question for the jury**." In the instant case, any inconsistencies found in C.H.'s testimony go [sic] the weight and credibility of her testimony, clearly a jury question. *In addition, C.H.'s testimony was not at all inconsistent on the*

4

> *issue at the heart of this matter—Collier's fondling of her*.
>
> *Collier* [*v. State*]*,* 711 So. 2d [458], 462-63 [(¶18) (Miss. 1998)] (emphasis added) (citations omitted).
>
> Based on this evidence, we find that the circuit court did not err in denying Ladnier's motions for directed verdict and for judgment notwithstanding the verdict.

*Id.* at 931 (¶¶16-17) (bold emphasis added).

¶8. Just as in *Ladnier*, it was the jury's responsibility to resolve any conflicts in the evidence and to determine the worth and weight to give the testimony of each witness. While Jane's testimony and prior statements during the CAC interview may have been inconsistent or contradictory in some respects, she was consistent in stating that Green had sexual intercourse with her. When considering the evidence presented by the State, we find that "any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution." *McLaughlin*, 338 So. 3d at 717 (¶33). Accordingly, the evidence was legally sufficient and this issue is without merit.

**II.     Did the trial court err by allowing prior-bad-acts evidence?**

¶9. As a part of the Gulfport Police Department's investigation in this case, they ran a criminal history check on Green and found that he had multiple arrests in New Orleans concerning crimes of a similar nature. The State was able to locate two witnesses from these prior arrests. In each case a complaint was made against Green, but there was no subsequent criminal prosecution in either case. The State gave the defense notice that it intended to offer the testimony of these two witnesses pursuant to Mississippi Rule of Evidence 404(b). At a

hearing conducted prior to trial, the State made a proffer of the expected testimony of the witnesses. The State advised the trial court that Yolanda Gash Robinson (Gash) and Rebecca Freeman Johnson (Freeman) were expected to testify that when they were teenagers, between the ages of fifteen and seventeen, Green sexually assaulted them and that each would testify as to the details of the attack on them by Green. The trial court heard the arguments in support of and in opposition to the admissibility of these witnesses' testimony. The State argued that this testimony was admissible under Rule 404(b)[4] to show that Green had "a seemingly uncontrollable desire to partake in . . . pedophiliac sexual activities with young and developing female juveniles" and was probative regarding motive. Green argued that the events were too remote in time and dissimilar and therefore, were irrelevant and highly prejudicial. The trial court found that the witnesses' expected testimony would be admissible pursuant to Rule 404(b) to show Green's motive, opportunity, and intent for the alleged assault upon Jane. The court further found that under Mississippi Rule of Evidence 403, the probative value of such testimony was not substantially outweighed by the danger of unfair prejudice. The court noted that this pretrial ruling was a "preliminary ruling," as there was still pending a ruling on the tender-years motion, and all was dependent upon Jane's testimony at trial. The court left open the possibility of further objections by the defense as the "evidence actually unfolds."

---

[4] Rule 404(b) reads as follows: "(1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. (2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

¶10.   At the time of trial, Gash was fifty-one years old. She testified that she went to high school at Fortier in New Orleans and that Green was a security guard there. When she was between the ages of fifteen and seventeen, she was walking down the hall and came into contact with Green who advised her she was going the wrong way. Gash testified that Green led her to a stairway that was under construction. Green then threw her against the wall and started kissing her and rubbing his head on her chest. He put his hand inside her shirt and touched her breast and then touched her private part. She was pushing him, trying to scratch him and she got away and went downstairs but the doors were locked. Green caught her again and started rubbing his private part against hers. Green told her that if she told anyone he was going to kill her and her family. It finally ended and she went to her teacher crying and told the teacher that she wanted to go home. Someone at the school called her parents. She did not remember whether she disclosed what happened while she was still at school or if she told her parents after she got home. In any event, she spoke with the police, but she does not know what happened with her complaint.

¶11.   Freeman was thirty-six years old at the time of trial. She testified that when she was fifteen years old she was a runaway and was living on the streets in New Orleans. She met Green in a picture shop on Canal Street. She went home with Green and he told her she could stay there. She stated that Green was in his thirties and no one else was living in his house. She said the first time Green approached her sexually, she resisted and he punched her in the face. After that she reluctantly let him have intercourse with her. She was scared, but she was living on the street and needed a place to live. She testified that there were other times when

7

he restrained her and forced himself on her. She stated that she lived with him for about three months and that Green did this repeatedly. He threatened to harm her if she told anyone. Shortly thereafter Freeman left and entered Girls and Boys Town.

¶12. Green argues that the trial court erred by allowing the testimony of Gash and Freeman. Green contends that such testimony was impermissible character evidence to show that he had a propensity to commit the offense against Jane because he had committed sexual offenses against Gash and Freeman. Green also argues that such testimony should have been excluded because those acts were dissimilar to the allegation here and too remote in time from the date of the indicted offense. Green contends he is entitled to a new trial due to the admission of this testimony.

¶13. Our analysis of this issue starts with the understanding that the trial court has a great deal of discretion regarding the admissibility of evidence. In *Lomas v. State*, 328 So. 3d 670, 688 (¶49) (Miss. Ct. App. 2021), this Court described our standard of review as follows:

> As noted earlier, the admissibility of evidence is reviewed under an abuse of discretion standard. *Saddler v. State*, 297 So. 3d 234, 241 (¶21) (Miss. 2020). "As long as the trial court remains within the confines of the Mississippi Rules of Evidence, **its decision to admit or exclude evidence will be accorded a high degree of deference**." *Magee v. State*, 300 So. 3d 1088, 1090 (¶9) (Miss. Ct. App. 2020). "Reversal is appropriate only when the circuit court's abuse of discretion results in prejudice to the accused." *Williams v. State*, 308 So. 3d 892, 894-95 (¶8) (Miss. Ct. App. 2020).

(Emphasis added).

¶14. We first address Green's allegation that the testimony of Gash and Freeman was nothing more than impermissible character evidence. This issue is framed for us in *Boggs v. State*, 188 So. 3d 515, 519-20 (¶¶11-12) (Miss. 2016):

8

> [Mississippi] Rule [of Evidence] 404 generally prohibits the admission of evidence of a person's character for the purpose of proving that he or she acted in conformity with that character on a particular occasion. Miss. R. Evid. 404(a). Evidence of "other crimes, wrongs or acts" is inadmissible as character evidence, but it may be admitted for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Miss. R. Evid. 404(b). The purposes listed in Rule 404(b) are not exhaustive; they simply are examples of noncharacter purposes for which evidence of other crimes, wrongs, or acts may be admitted. *Green v. State*, 89 So. 3d 543, 549 n.12 (Miss. 2012).

> Prior to 2008, evidence of a defendant's sexual misconduct involving other minor victims was considered to be so prejudicial as to be per se inadmissible, even if such evidence was offered for a permissible noncharacter purpose under Rule 404(b). *See, e.g.*, *Mitchell v. State*, 539 So. 2d 1366, 1372 (Miss. 1989), *overruled by Derouen v. State*, 994 So. 2d 748 (Miss. 2008). However, in *Derouen*, this Court explicitly overruled *Mitchell* and its progeny, holding that evidence of other sexual misconduct, "if properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction to the jury, should not be considered per se error." *Derouen*, 994 So. 2d at 756 [(¶20)].

The trial court was required to find that the testimony was admissible for a "permissible noncharacter purpose under Rule 404(b)." The alleged victim here was eight years old at the time of the alleged sexual assault. Gash and Freeman were fifteen to seventeen years old at the time they were allegedly sexually assaulted by Green. The State argued that the evidence was admissible pursuant to Rule 404(b) for the purpose of showing that Green had "a seemingly uncontrollable desire to partake in . . . pedophiliac sexual activities with young and developing female juveniles." After considering the matter, the trial court found that such testimony was admissible for Rule 404(b) purposes with regard to Green's motive, opportunity, and intent. Further, the trial court found that the probative value of such testimony was not substantially outweighed by the danger of unfair prejudice. At the

9

conclusion of the trial, the court gave a proper limiting instruction, confining the jury's consideration of such testimony to these issues.[5]

¶15.    Second, Green argues that the acts described by Gash and Freeman are dissimilar to the acts alleged in this case and that those acts were too remote in time to be relevant in this proceeding. He cites *White v. State*, 228 So. 3d 893 (Miss. Ct. App. 2017), in support of his argument. However, in *Anderson v. State*, 293 So. 3d 279, 288 (¶24) (Miss. Ct. App. 2019), the Court found:

> *White v. State* does not apply here. In contrast to the circumstances in *White*, there is a very strong similarity between the circumstances described by Ann and Sally and those described by Susan. Further, in *Gore v. State*, 37 So. 3d 1178 (Miss. 2010), the supreme court rejected the same "remote-in-time" argument Anderson makes here, citing numerous cases in which the courts found no abuse of discretion in admitting testimony about abuse incidents occurring decades before the events in question. *Id*. at 1187 (¶20). As the supreme court recognized, "'even though the other crimes evidence may appear to be remote in time in some instances, the incidents are all within the same time period in terms of the victims' lives . . . .'" *Id*. at 1187 (¶19) (quoting *State v. Driggers*, 554 So. 2d 720, 727 (La. Ct. App. 1989)); *see Green* [*v. State*], 89 So. 3d [543], 547 (¶¶5-8) [(Miss. 2012)] (finding no abuse of discretion in allowing testimony of other sexual offenses occurring five to nearly forty years before the offense at issue). The same analysis applies here. We find Anderson's "remote-in-time" argument without merit.

The acts described by Jane, Gash, and Freeman involved forcible sexual assaults of young girls in somewhat isolated circumstances, and all the girls feared Green. They were all

_____

[5] Jury Instruction 11 provided: "You have heard evidence about the defendant's acts with other individuals about which the defendant is not on trial before you. You are not to consider these acts as evidence that the defendant committed the crime for which he is now charged. You may consider the other acts for the limited purpose of establishing proof of motive, opportunity, or intent. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charge for which he is presently on trial."

between the ages of eight and seventeen, quite similar to the range in ages of the witnesses in *Anderson*. Further, in *McGrath v. State*, 271 So. 3d 437, 442 (¶18) (Miss. 2019), cited by the State at trial, the supreme court explained:

> What is relevant, however, is this Court's emphasis that any evidence that tends to show a "seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles, is probative regarding motive." *Young* [*v. State*], 106 So. 3d [775,] 779 [(¶14) (Miss. 2019)] (internal quotation marks omitted) (quoting *Green* [*v. State*], 89 So. 3d [543,] 550 n.19 [(Miss. 2012)]. And a jury may hear evidence of a "'defendant's means of accomplishing these activities'" if they "'bear substantial resemblance to each other and with the present offense.'" *Id.* (quoting *Gore v. State*, 37 So. 3d 1178, 1186 [(¶18)] (Miss. 2010)). McGrath's motives and opportunity were similar—he used his position of trust, while alone with his stepchildren, to sexually abuse them. That there were differences in severity of some of the assaults and molestations and that one of his stepchildren was three or four and the other thirteen did not negate his substantially similar opportunities and pedophilic motives.

Again, in the present case, Jane was an eight-year-old girl who, according to her testimony, previously had been physically assaulted by Green, and she was scared of him. He sexually assaulted her when they were in her house, with no one else present except her blind father who was asleep. Gash was a young teenager, about fifteen years old, when Green, a security guard, caught her in the hallway alone. He directed her to a more isolated stairwell where he sexually assaulted her. Afterward, he threatened to harm her and her family. Freeman was a fifteen-year-old runaway whom Green took into his home. He attempted to sexually assault her in his home, and when she resisted, he punched her in the face to accomplish his goal. The argument that these events are dissimilar and too remote is without merit. We find that the testimony of Gash and Freeman was properly admitted and that the jury was properly instructed regarding their testimony.

11

### III. Did the trial court commit reversible error by finding that Green could not attempt to impeach the victim's testimony by using allegedly inconsistent statements by the victim to Daniel Dooley in a recorded interview?

¶16. In addition to Jane's 2018 interview with Flagg, there was a second forensic interview conducted by Daniel Dooley on April 3, 2019. Green contends that the trial court erred by prohibiting him from presenting the testimony of Dooley as to statements Jane made to him during their recorded interview that were inconsistent with either Jane's trial testimony or her CAC interview with Flagg. He contends that Dooley's testimony was admissible for impeachment purposes pursuant to Mississippi Rule of Evidence 613(b), which provides:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible **only if the witness is given an opportunity to explain or deny the statement** and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under [Mississippi] Rule [of Evidence] 801(d)(2).

(Emphasis added).

¶17. At trial, during Green's cross-examination of Jane, she denied having given a statement to Dooley. However, Green did not then go forward in his cross-examination and confront Jane with any statements from that interview that Green alleges are inconsistent with her testimony. She was not "*given an opportunity to explain or deny*" any alleged inconsistent statement. Therefore, the trial court ruled that Dooley could be called to impeach Jane as to whether she gave him a statement, but because a proper foundation had not been laid pursuant to Rule 613, Dooley could not testify as to the contents of his interview. As stated above, the trial court's decision to exclude such testimony should be "accorded a high degree of deference" and should be reversed only if we find that the trial court abused its

12

discretion and such action caused prejudice to Green. *Lomas*, 328 So. 3d at 688 (¶13).

¶18. This issue had its genesis well before trial. The State disclosed that it intended to offer the two forensic interviews of Jane into evidence at trial through the tender years exception to the hearsay rule. MRE 803(25). A pretrial hearing was conducted on October 16, 2020, at which both Flagg and Dooley testified for the State concerning their recorded interviews of Jane. Copies of both interviews were admitted as evidence for purposes of the "tender years" ruling. At the conclusion of the hearing, the trial court reserved its ruling on the admissibility of the interviews until after Jane appeared at trial and testified.

¶19. Then, on July 20, 2021, after the jury was selected and just before opening statements, the State brought forward its motion pursuant to Mississippi Rule of Evidence 412 to prohibit the defense from placing any evidence before the jury of any allegation of sexual contact between Jane and another man. The State argued that Dooley's interview was conducted after Jane allegedly made a report of another adult man having sex with her. Because the defense had not filed the notice and followed the procedure required by Rule 412(c), the State sought to prevent the defense from placing before the jury any testimony concerning Jane's allegation of sexual contact with another man. The defense reminded the trial court that the State had already tendered Dooley's interview for admission into evidence during the tender years hearing described above. Green also advised the court that it had subpoenaed Dooley and expected to call him as a defense witness. The defense argued that if the State "opened the door" by admitting Dooley's interview, the defense should be able to get into "why" there was a second interview.

¶20.   The trial court ruled that because the defense failed to file a timely Rule 412 motion, Green could not introduce evidence of Jane's allegation of sexual contact with another man. The trial court further ruled, without opposition from the State, that if Dooley's interview was introduced into evidence by the State, the defense could ask why a second interview was conducted, without going into the details of the allegation. However, the State continued to argue that if the State did not offer Dooley's interview into evidence, the defense could not "get into it."

¶21.   Green then argued that the defense should be able to "get into" Dooley's interview to the extent Jane talked about the case against Green. The defense stated, "I fail to see how that's not relevant and how it's not admissible particularly if she's going to give inconsistent statements between the two interviews concerning the same time."

¶22.   The trial court emphasized again, prior to the beginning of the trial, that should the State introduce Dooley's interview into evidence, the defense could ask why there was a second interview of Jane but could not go into the details of her allegations. However, if Dooley's interview was not introduced by the State, then Green could not get into Jane's allegation of sexual contact with another man. The trial court itself raised the possibility that the defense could use Dooley's interview for impeachment purposes whether the State offered it into evidence or not. The trial judge noted, "[A]nd so we'll have to cross that bridge when we get to it."

¶23.   Defense counsel, in an attempt to clarify the trial court's ruling, stated, "I would still likely get into the second interview specifically as to relates to the allegations against Mr.

14

Green." The trial court clarified that if not introduced by the State, the defense could use Dooley's interview for impeachment purposes only. However, the court specifically stated that the entire interview could not be played for impeachment purposes but that **parts may be admissible if the proper foundation is laid**. At that point, court recessed for the day, and the trial continued the following day.

¶24. Jane, who was eleven years old at the time of trial, was the State's first witness. During direct examination, the State did not question Jane about the statements she gave to Flagg or Dooley. The interview with Flagg was briefly mentioned at the end of direct with the following exchange:

> Q. And do you remember that after you told your dad about this that you went and spoke to a lady named Ms. Sarah about this?
>
> A. Yes, sir.
>
> Q. Okay. And is what you told Ms. Sarah the truth?
>
> A. Yes, sir.

¶25. Then, during cross-examination, the defense asked Jane, "Did you ever have a conversation with any police officers or anybody of authority that was trying to help in this?" After Jane responded, "No, sir," the defense reminded her that the State had asked her about her conversation with Flagg and at that Jane acknowledged that she had spoken with Flagg. After Jane stated that she had not talked with anyone else, the defense asked, "[Y]ou never talked to another person named Daniel Dooley that works in the same building?" Jane responded that she had not talked with him and upon further questioning, she testified that she had never talked with anyone else about the incident.

15

¶26.    The defense then turned its attention to the interview with Flagg. Defense counsel asked, "And the same statement that you're telling this court here today is the same thing that you told Ms. Flagg, right?" After Jane said that it was, defense counsel inquired, "It's not different?" At which point Jane stated that she did not remember. When asked whether she remembered telling Flagg that she had been "duct taped" by Green, Jane said she did not remember. Counsel then asked whether she remembered any of the statements she made to Flagg, and Jane said she did not.

¶27.    Because Jane testified that she could not recall all the details of the Flagg interview, the defense sought to refresh her recollection by playing portions of the interview outside the presence of the jury. The jury was excused, and another hearing was conducted concerning the playing of the Flagg interview, which had not yet been admitted into evidence at trial. The issue was resolved by the defense waiving its objection to the admissibility of the recorded interview with Flagg under the tender-years exception. With the agreement of the State, the recorded interview was admitted as a joint exhibit and was played for the jury while Jane was still under cross-examination.

¶28.    Green's counsel conducted a full bore cross-examination of Jane concerning the differences between her testimony on direct examination, her interview with Flagg, and her testimony on cross-examination. However, Green's counsel never asked *any* questions of Jane concerning *any* statements she may have made to Dooley.

¶29.    After the State had rested its case-in-chief and the trial court had denied the defense's motion for a directed verdict, the trial court asked Green's counsel how many witnesses he

16

expected to call and asked for an estimate of the amount of time that would be required to put on the defense's case. Defense counsel advised the court that it intended to call Dooley and to play the video. Green's counsel stated:

> We intend to play the video. I don't intend to get any testimony with him really. 45 minutes. I can't remember how long the video is.

The State objected to Dooley being called by the defense because of the court's ruling on its Rule 412 motion. The State reminded the trial court that it had ruled that if the State did not admit the recorded interview, then the defense could only use it for impeachment purposes. The State further argued that it was not proper for impeachment because the defense did not confront Jane with any statement she may have made in Dooley's interview.

¶30. In response, the defense argued that it had confronted Jane and that she denied having spoken to Dooley. The trial court then stated that it would be proper impeachment to have Dooley testify that he conducted an interview with Jane, but the defense could not go into the substance of the interview because a proper foundation had not been lain.

¶31. The hearing on the State's motion to exclude Dooley's testimony continued and was extensive. The trial court gave Green's counsel time to check the record to find any evidence that he had confronted Jane with *any* statement she had made to Dooley. During an extended lunch break, the trial judge also gave both sides the opportunity to provide the court with authorities to support their relative positions.

¶32. When the hearing resumed, although it had been Green's expressed intention to offer the entire video of Dooley's interview into evidence, Green's defense offered no authority or basis to support the admission of the entire interview into evidence. Accordingly, the only

17

issue before the trial court was the extent to which Dooley could testify for impeachment purposes. The defense was unable to point the trial court to any instance where Jane was confronted with any alleged inconsistent statement she made to Dooley.

¶33.    The trial judge cited *Wilkins v. State*, 603 So. 2d 309, 319 (Miss. 1992)*, overruled in part by Carothers v. State*, 152 So. 3d 277, 282 (Miss. 2014); *Caston v. State*, 823 So. 2d 473, 493 [(¶59)] (Miss. 2002); *Pustay v. State*, 221 So. 3d 320, 332 [(¶16)] (Miss. Ct. App. 2016); *Thames v. State*, 310 So. 3d 1163, 1172 [(¶43)] (Miss. 2021) (being the most recent decision from the Mississippi Supreme Court) and *Augustine v. State*[6] (being the most recent decision from the Mississippi Court of Appeals), concerning the admissibility of extrinsic evidence under Rule 613. Based on these cases, the trial judge ruled that Jane's prior unsworn statements from the Dooley interview could only be admissible for impeachment purposes. The trial court further ruled that because Green had not confronted Jane with any inconsistent statement, a proper foundation had not been laid for Green to impeach Jane's testimony with any prior inconsistent statement she may have made to Dooley.

¶34.    The trial court allowed the defense to call Dooley in its case-in-chief to impeach Jane's testimony that she had not talked with him about this case. However, the defense was not allowed to go into the details of her statement to Dooley. Thereafter, the defense called Dooley as its witness and he testified that Jane had in fact given him a statement in this matter.

_____

[6] *Augustine v. State*, 2020 WL 7350676 (Miss. Ct. App. Dec. 15, 2020), *rev'd*, 337 So. 3d 646 (Miss. 2022), was reversed by the Mississippi Supreme Court's decision discussed later. *See infra* at ¶¶35-40.

18

¶35. On appeal, Green relies heavily upon the Mississippi Supreme Court's ruling in

*Augustine v. State*, 337 So. 3d 646 (Miss. February 10, 2022),[7] to support his claim that the

trial court erred by failing to allow Jane to be impeached with the contents of her inconsistent

statements to Dooley. Based upon this case, *which was decided almost six months after the*

*trial in this case*, Green argues

> It would be inaccurate to say that *Augustine* and the current case are
> analogous. Rather, they [*are*] *the exact same* - except for the fact that the trial
> court's ruling in this case implicates Green's constitutional rights. There can
> be no distinction; therefore, reversal is required.

As discussed below, we disagree.

¶36. In *Augustine*, the defendant was indicted for the first-degree murder of Nigel Poole.

*Augustine*, 2020 WL 7350676, at *1 (¶¶1-2). The case was tried in Harrison County Circuit

Court, and Augustine was found guilty of the lesser-included offense of second-degree

murder. *Id.* At trial, during its case-in-chief, the State called Irby Jules to testify as to

incriminating statements Augustine had made to Jules relative to the murder of Poole and to

identify Augustine. *Id.* at *2 (¶¶8-10). However, Jules became unexpectedly hostile and

refused to identify Augustine in the courtroom, even though he had testified that he knew

him from the neighborhood. *Id.* at (¶8). Further, Jules denied having ever given a statement

to the police. *Id.* When the prosecutor attempted to confront Jules with the specifics of his

prior statement to Gulfport Police Officer Keyhoe, as required by Rule 613, the trial court

sustained the defense objection and would not allow the State to get into the details of the

---

[7] We use the Court of Appeals' now-reversed opinion to explain the case's
background.

19

statement. *Id.* at (¶¶8-9).

¶37.    Later, outside the presence of the jury, the State advised the trial court that it intended to call Officer Keyhoe to impeach Jules with his prior statement and made a proffer of his testimony. *Id.* at (¶9). Keyhoe testified, first outside the presence of the jury, that Jules had told him about statements Augustine had made to him prior to the murder. *Id.* According to Keyhoe, Jules told him that Augustine said he wanted to "catch a body," meaning that he wanted to kill someone. *Id.* Jules also told Keyhoe that Augustine had offered to sell him a .38-caliber revolver for $150 one week before the murder of Poole. *Id.* Jules further advised Keyhoe that he believed that Augustine and Poole were having relations with the same girl. *Id.* at (¶10).

¶38.    After the proffer, the defense did not object to Keyhoe testifying that Jules had given him a statement, but objected to Keyhoe testifying as to the details of that statement. *Id.* at (¶9). The defense argued that the only statement Jules made at trial that was subject to impeachment was that he had not given police a statement. However, the trial court overruled the defense objection and allowed Keyhoe's testimony before the jury as to the details of Jules's prior statement. *Id.* The trial court gave the jury a limiting instruction that Keyhoe's testimony could only be used for the evaluation of the truthfulness of Jules's testimony and that the jury could not consider the prior statement by Jules as evidence of the truth of the matters contained in the statement. *Id.* at *6 (¶25).

¶39.    On appeal, this Court found that the trial court erred by allowing Keyhoe to testify as to the details of Jules' prior statement. Because the only statement that Jules made that was

subject to impeachment was that he had not given a statement to the police, this court found that the details of Jules statement "was inadmissible hearsay and prejudicial to Augustine's defense, as it provided the only evidence of a motive for the shooting." *Id.* at \*4 (¶19). This Court further found that the prejudice was not cured by the limiting instruction. *Id.* Augustine's conviction was reversed and the case remanded for a new trial.

¶40.    On certiorari, the Mississippi Supreme Court reversed the decision of this Court and reinstated Augustine's conviction. *Augustine*, 337 So. 3d at 653 (¶33). The supreme court found that "Keyhoe's testimony regarding Jules's prior statement was to demonstrate the clear inconsistency of Jules's testimony." *Id.* at 650 (¶16). The court further found that the prejudicial effect of such testimony "fails to substantially outweigh the probative value of Keyhoe's comments." *Id.* at 651 (¶19). The court noted that any prejudice resulting from this testimony was alleviated by the trial court's limiting instruction to the jury. *Id.* at 650-51 (¶¶17-18). The supreme court went on to state that even if it were to find error by the admission of Keyhoe's testimony, it was harmless under the facts of that case. *Id.* at 652-53 (¶¶27-32).

¶41.    While both *Augustine* and the case at bar involve the admissibility of prior inconsistent statements pursuant to Rule 613 to impeach the credibility of a witness who denied even having made a statement, the similarities stop there. In *Augustine*, the State called a witness in its case-in-chief, Jules, who became unexpectedly hostile. Jules refused to identify the defendant, Augustine, in the courtroom even though he had just testified that he knew Augustine "from the neighborhood." Jules also denied having ever given police a

21

statement. The State tried to lay a foundation, pursuant to Rule 613, to impeach Jules by confronting Jules with specifics from the statement he had given Officer Keyhoe. However, the trial court sustained the defense's objection and would not allow the State to question Jules concerning the details of the statement.

¶42. The present case differs from *Augustine* on several important points. First, this was not a case where the State was trying to impeach its own witness; it was the defense trying to impeach a State's witness. This was not an unexpectedly hostile witness who refused to identify a person he testified he knew, who was sitting in front of him in the courtroom. This was not an adult who had given a detailed statement to the police relative to a homicide and then denied having done so. Green sought to impeach Jane, who was eight years old on the date of the offense, and on the date of the Flagg interview. She was nine years old at the time of the Dooley interview on April 3, 2019, over a year later. Jane was eleven when she testified at trial. The child clearly had little independent recollection of the interviews with Flagg and Dooley, which had occurred over two years earlier.

¶43. This position is supported by the fact that when Jane could not recall the contents of the Flagg interview during cross-examination, the defense offered to refresh her recollection by playing the interview for her outside the presence of the jury. In the end, the Flagg interview was admitted into evidence by the agreement of both parties during Green's cross-examination of Jane. The entire interview was played, and Jane was cross-examined at length concerning perceived differences with her testimony during direct examination.

¶44. As noted above, Green did not attempt to confront Jane with any inconsistencies from

the Dooley interview. Green did not offer to refresh Jane's recollection by playing the Dooley interview outside the presence of the jury, as he had done with the Flagg interview. Unlike the prosecution in *Augustine*, Green was not prevented by the trial court from confronting Jane about specific statements she may have made in the Dooley interview in order to lay a proper Rule 613 foundation. Green did not attempt or offer to recall Jane to the stand in his case-in-chief in order to remedy the situation and give her the "opportunity to explain or deny" whatever statement he intended to introduce through Dooley's testimony. In other words, Green did nothing to lay a foundation to offer extrinsic evidence to impeach Jane's trial testimony pursuant to Rule 613.

¶45. The supreme court has recognized that the comment to Rule 613 relaxed the time or sequence within which to confront a witness with a prior inconsistent statement, but the court explained in *Whigham v. State*, 611 So. 2d 988, 994-95 (Miss. 1992), *overruled on other grounds by Dora v. State*, 986 So. 2d 917 (Miss. 2008):[8]

> As the comment to Rule 613(b) states, the foundation requirement of our pre-rules decisions was preserved, but with some modifications. There is no requirement that the witness's attention be directed to a particular time or sequence. *U.S. v. Nelson*, 574 F.2d 277 [(5th Cir. 1978)], *cert. den.* 439 U.S. 956, 99 S. Ct. 355, 58 L. Ed. 2d 347 (1978); *U.S. v. Bibbs*, 564 F.2d 1165 [(5th Cir. 1977)], *cert. den.* 435 U.S. 1007, 98 S. Ct. 1877, 56 L. Ed. 2d 388 (1978).

> As *Harrison* [*v. State*, 534 So. 2d 175 (Miss. 1988),] makes clear, however, before impeachment testimony will be permitted some foundation must be laid. In that case the State sought to impeach a witness, Ray Patty, as to prior statements he had made to Coleman, a police officer:

---

[8] The Mississippi Supreme Court in *Augustine* again recognized the continued requirement that a witness must be afforded an opportunity to explain or deny the statement by citing *Johnson v. State*, 905 So. 2d 1209 (Miss. 2005), which complied with the court's holding in *Whigham*.

> . . . M.R.E. 613(b) was complied with in that the witness Ray Patty was given an opportunity to explain or deny his statements, and Patty was available for interrogation by opposing counsel. Officer Coleman was likewise available by counsel for the defendant.

*Harrison*, 534 So. 2d at 179.

If counsel for a party desires to impeach the testimony of a witness with some pretrial, out-of-court statement that is inconsistent with his trial testimony, it is only fair that the witness, while he is on the stand, be asked about it, and be given an opportunity to explain or deny it. Nor does this create any difficulty to counsel.

It is manifestly unfair, after the witness has been excused, to attempt to offer a pretrial inconsistent statement of the witness into evidence, and no trial court should be faulted for excluding such hearsay testimony in the absence of laying any foundation. In this case counsel surely knew prior to trial about the statements Stewart allegedly made to Phyllis. Yet he did not ask Stewart a single question about any of them.

There may be instances in which a pretrial inconsistent statement of a witness will not be known until after the witness has left the stand. In such an instance a trial judge in the interest of justice may permit the introduction of such statement, but only after making sure that the witness is available for recall and is given an opportunity to explain or deny the statement. Even here, however, it would be better procedure to permit the witness to be recalled for further examination and asked about the statement, and given an opportunity to explain or deny it, rather than introducing the statement and then recalling the witness.

We make these extended observations about the rather plain provisions of Rule 613(b) because of our recent decision, *Marcum v. Mississippi Valley Gas Co.*, 587 So. 2d 223 (Miss. 1991), [*overruled in part by Whigham v. State*, 611 So. 2d 988, 994 (Miss. 1992),] in which we held it was reversible error for a circuit court to exclude a pretrial inconsistent statement of a witness for which no foundation had been laid while the witness was on the stand. We adhere to our holding in *Marcum* that there may be instances, as above noted, in which a trial court in the interest of justice has the discretion of admitting a pretrial inconsistent statement of a witness into evidence for which no predicate was laid of the witness, but only after the court has seen to it that the witness is

24

available for recall and is given an opportunity to deny. *Marcum*, however, is overruled insofar as it is contrary to our holding today.

**Because no foundation was laid for the introduction of any pretrial statements** of Stewart, the court made no error in excluding any testimony of Phyllis Bounds as to any such statement.

**There is an additional reason why the circuit judge did not err in excluding questions to Phyllis about pretrial statements of Stewart: There was no profert made by counsel as to what Phyllis would testify, if permitted to do so.** Rule 103(a)(2) M.R.E.; *Tigner v. State*, 478 So. 2d 293 (Miss. 1985); *Hammond v. Grissom*, 470 So. 2d 1049 (Miss. 1985).

(Emphasis added) (footnote omitted).

¶46. Again, unlike the prosecution in *Augustine*, Green made no proffer of Dooley's expected testimony. While Dooley's recorded interview was admitted for purposes of the tender years hearing only, the State had abandoned its effort to introduce Dooley's interview during its case-in-chief. During the extensive hearings on this matter, Green made no attempt to identify any prior statements made by Jane during her interview with Dooley that were inconsistent with her trial testimony or statements made in her Flagg interview (which was in evidence at that point). Green was in possession of the recorded interviews of both Flagg and Dooley for months before trial and had ample opportunity to prepare to confront Jane concerning any inconsistencies in her interview with Dooley. In fact, he did confront Jane with inconsistencies based upon her interview with Flagg. Further, there was no reason that Green was unable to make a proffer of the testimony he wanted to elicit from Dooley in an effort to impeach Jane's credibility as required by Mississippi Rule of Evidence 103(a), which states:

(a) **Preserving a Claim of Error**. A party may claim error in a ruling to admit

25

or exclude evidence only if the error affects a substantial right of the party and:

. . . .

>     (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

¶47.    Despite the fact that the trial court's attention was focused upon whether Green had confronted Jane with a prior inconsistent statement she made to Dooley, it was still incumbent upon Green to make a proffer of the testimony he proposed to present through Dooley in order to preserve the issue for purposes of appeal. In *Johnson v. State*, 311 So. 3d 1161, 1173 (¶22) (Miss. Ct. App. 2020), this Court stated:

> This Court has held that an appeal of a trial court's limitation of evidence, without a proffer from the defendant as to the nature of the evidence in the record, was not reversible error. *Williams v. State*, 281 So. 3d 263, 271 (¶19) (Miss. Ct. App. 2019) (finding it "impossible" to find error in the trial judge's ruling to limit improper character evidence because the defense failed to offer a "proffer of the nature of the character evidence"). "**When a trial court rules so as to prevent certain testimony from being introduced, it is incumbent on the party to make a proffer of what the witness would have testified to or the point is waived for appellate review.**" *Turner v. State*, 732 So. 2d 937, 951 (¶55) (Miss. 1999).

(Emphasis added). We find Green failed to lay the proper foundation pursuant to Rule 613(b) for the admission of a prior inconsistent statement from Dooley's interview with Jane. Further, Green failed to preserve this issue for appellate review by failing to proffer Dooley's expected testimony pursuant to Rule 103(a)(2).

**IV.    Was the jury's verdict against the overwhelming weight of the evidence?**

¶48.    The standard of review where the appellant/defendant contends that the verdict was against the overwhelming weight of the evidence is set forth in *Carson v. State*, 341 So. 3d

26

995, 1000 (¶¶10-11) (Miss. Ct. App. 2022):

> We review a trial judge's denial of a motion for a new trial only for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). Our standard of review is deferential because the "trial judge is in the best position to view the trial." *Id.* at 291 (¶18) (quoting *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶16) (Miss. 2000)). "The trial judge who hears the witnesses live, observes their demeanor and in general smells the smoke of the battle is by his very position far better equipped to [rule on a new trial motion]." *Id.* at 291-92 (¶18) (quoting *Amiker*, 796 So. 2d at 947 (¶16)).
>
> In addition, when we review the denial of a motion for a new trial, we afford great deference to the jury and its verdict. *Little*, 233 So. 3d at 289 (¶1). The jury is the fact-finder, and this Court will not "assume the role of juror on appeal." *Id.* As the Supreme Court made clear in *Little*,
>
>> [w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

The jury heard Jane testify that Green had sexual intercourse with her, and they heard Green testify that he did not. The jury heard the cross-examination of both Jane and Green. They heard other evidence that showed that Jane was below the age of fourteen and that Green was more than twenty-four months older than her when they had sexual intercourse. The jury was given proper instructions of law, which included those elements that the State was required to prove beyond a reasonable doubt before the jury could return a verdict of guilty of sexual battery. As stated above, we do not reweigh evidence, and we do not determine the credibility of the various witnesses. This is the province of the jury. The jury heard all the testimony and observed all the witnesses. To the extent there were conflicts in the evidence, it was their

duty to resolve those conflicts, if they could unanimously do so. Considering the evidence in this case in the light most favorable to the jury's verdict, we cannot say that to allow the verdict to stand would be to sanction an unconscionable injustice.

## CONCLUSION

¶49. We find that there was legally sufficient evidence to support the jury's verdict finding Green guilty of sexual battery. The jury's verdict was not against the overwhelming weight of the evidence, and we find that to allow the verdict to stand will not sanction an unconscionable injustice. Finally, the trial court did not abuse its discretion by allowing the testimony of Gash and Freeman and by excluding Dooley's testimony concerning statements Jane made to him. Accordingly, Green's conviction and sentence are affirmed.

¶50. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS AND LAWRENCE, JJ., CONCUR. McCARTY, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**